KIRK J. HOUSTON, ISB #9055
TARA MALEK, ISB #8709
SMITH + MALEK, PLLC
101 S Capitol Blvd, Ste. 930
Boise, Idaho 83702
P.      (208) 473-7009
F.      (208) 473-7661
E.      service@smithmalek.com

Attorneys for Trustee

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>RYAN WILLIAM HAWKES,<br>SUZANN MARGARET HAWKES,<br><br>Debtors. | Case No. 19-00880-JDP |
| FORD ELSAESSER, solely in his capacity as Chapter 7 Trustee for the above-referenced bankruptcy estate,<br><br>    Plaintiff<br><br>vs.<br><br>DA CAPITAL INVESTMENTS,  LLC, an Idaho limited liability Company; DOES 1-5,<br><br>    Defendants. | Adversary No. 21-_____JDP<br><br>COMPLAINT TO AVOID UNPERFECTED LIEN |

The Plaintiff, FORD ELSAESSER (the "Trustee"), by and through his counsel of record

SMITH + MALEK, PLLC, complains and alleges as follows:

COMPLAINT TO AVOID UNPERFECTED LIEN - 1

**NATURE OF ACTION**

1.      In this Adversary Proceeding, the Trustee seeks an order avoiding, as an unperfected or invalid lien pursuant to 11 U.S.C. §§ 544, 550 and/or 558, the lien held by DA Capital Investments, LLC ("DA Capital") in a parcel of real property located in Ada County, Idaho, legally described as:

> LOT 14, BLOCK 44 OF BROOKWOOD SUBDIVISION NO. 10, ACCORDING TO THE OFFICIAL PLAT THEREOF, FILED AS INSTRUMENT NO. 104066870 IN BOOK 89 OF PLATS AT PAGES 10,263 THROUGH 10,266, RECORDS OF ADA COUNTY, IDAHO. SUBJECT TO RESTRICTIVE COVENANTS AND CONDITIONS RECORDED OCTOBER 30, 2001, INSTRUMENT NO. 100013379, RECORDS OF ADA COUNTY, IDAHO
>
> Property Tax Parcel Number: R1097050120

(hereinafter, the "Property").

**PARTIES**

2.      Plaintiff, Ford Elsaesser, is the duly-appointed Chapter 7 Trustee of the above referenced bankruptcy proceeding.

3.       Upon information and belief, Defendant DA Capital Investments, LLC is an Idaho limited liability company with an address of 3059 S. Bear Claw Place, Meridian, Idaho 83642 which allegedly holds a lien against the Property pursuant to a certain deed of trust.

4.      Defendants Does 1-5 are individuals or entities which may also claim an interest in the Property by virtue of the DA Capital lien. The exact identity of these parties is presently unknown. Should the Trustee become aware of the identities of these parties (if any), the Trustee will amend this Complaint to name those additional parties.

COMPLAINT TO AVOID UNPERFECTED LIEN - 2

**JURISDICTION AND VENUE**

5.      This Adversary Proceeding arises under Title 11 of the United States Code and arises in or is related to the captioned Chapter 7 case now pending in the United States Bankruptcy Court for the District of Idaho at Case Number 19-00880-JDP.

6.      This Court has jurisdiction over this adversary proceeding pursuant to the provisions of 11 U.S.C. § 105 and 28 U.S.C. §§ 157, 2201 and 1334, all pursuant to the standard order of reference entered in this District.

7.      The Trustee asserts the claims being pursued in this Adversary Proceeding are "core proceedings" pursuant to 28 U.S.C. § 157 and related authority. To the extent the claims pursued herein are not core proceedings, the Trustee expressly consents to the Bankruptcy Court entering final orders and judgments on all claims in this proceeding.

8.      To the extent not a core proceeding, this is a "related to" proceeding under 28 U.S.C. § 157(c). Venue is proper under 28 U.S.C. § 1409(a).

9.      This proceeding is brought pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7065 and 7001(7) of the Federal Rules of Bankruptcy Procedure.

**FACTUAL BACKGROUND**

10.      Prior to May 25, 2017, DA Capital agreed to loan C.A.R.S. Enterprises, Inc., an Idaho limited liability company, the sum of $2,800,000.00 (the "C.A.R.S. Loan").

11.      On or about May 25, 2017, a Loan Agreement and Promissory Note were created evidencing the C.A.R.S. Loan (the "C.A.R.S. Loan Agreement" and "C.A.R.S. Promissory Note").

12.      Attached hereto as Exhibit A and Exhibit B are true and correct copies of the C.A.R.S. Loan Agreement and the C.A.R.S. Promissory Note.

13.     The Loan Agreement and the Promissory Note were signed by Ryan Hawkes, Debtor, in his capacity as President of C.A.R.S. Enterprises, Inc.

14.     On May 25, 2017, a deed of trust was signed, allegedly to secure the C.A.R.S. Promissory Note (the "Deed of Trust").

15.     A true and correct copy of the Deed of Trust is attached hereto as Exhibit C.

16.     Ryan Hawkes and Suzann Hawkes, Debtors, signed the Deed of Trust on page 25 in their individual capacities.

17.     One of the properties purportedly encumbered by the Deed of Trust is the Property.

18.     At all relevant times, Debtors owned the Property.

19.     Ryan Hawkes' and Suzann Hawkes' signatures were notarized by Curtis Grieve, with the notary acknowledgment stating as follows:

> On the 25 day of May, 2017, Ryan W. Hawkes and Suzann Hawkes, the signers of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that they executed the same.

Exhibit C, at 25.

20.     Notwithstanding the language in the notary acknowledgment, there was no actual acknowledgement of the document by Suzann Hawkes and/or Ryan Hawkes before Curtis Grieve.

21.     The Deed of Trust was recorded in the official records of Ada County, Idaho on December 27, 2017 as Instrument No. 2017-123413.

22.     On or about July 31, 2019, (the "Petition Date"), Ryan Hawkes and Suzann Hawkes filed a Chapter 7 Voluntary Petition (Case No. 19-00880-JDP - the "Bankruptcy Case").

23.     On or about August 28, 2019, Noah Hillen was appointed as Chapter 7 Trustee in the Bankruptcy Case.

COMPLAINT TO AVOID UNPERFECTED LIEN - 4

24.    On or about August 31, 2020, Trustee was appointed as the successor trustee in the Bankruptcy Case.

## CLAIM 1- AVOIDANCE OF UNPERFECTED LIEN

25.    Trustee reasserts all the foregoing paragraphs as if fully set forth again herein.

26.    As of the commencement of a case, a trustee has the rights and powers of or may avoid any transfer of property of the debtor that is voidable by (a) a judgment creditor, (b) a secured creditor, or (c) a bona fide purchaser of the property. 11 U.S.C. § 544(a)(1)-(3).

27.    As of July 30, 2019, the Trustee assumed the rights and powers of a judgment creditor, secured creditor of bona purchaser of the Property.

28.    At all relevant times, Debtors were the sole owners of the Property.

29.    The Deed of Trust contains the following Notary Acknowledgment:

> On the 25 day of May, 2017, Ryan W. Hawkes and Suzann Hawkes, the signers of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that they executed the same.

30.    Pursuant to Idaho law in effect when the Deed of Trust was notarized, before an instrument may be recorded, it must be properly acknowledged by the person executing it. Idaho Code §§ 55-707, 55-805; *Salladay v. Bowen,* 161 Idaho 563, 388 P.3d 577 (2017).

31.    Pursuant to Idaho law in effect when the Deed of Trust was notarized, the notary cannot take the requisite acknowledgment unless the signer of the instrument declares that he or she has, in fact, executed the instrument. *See Hillen v. Lucille Borses Family Trust (In re Shiloh Mgmt. Servs., Inc.*), 2020 WL 6038301 at *8-9. If the notary does no more than confirm the identity of the signer of the document and observe the signature, the notary has not carried out his or her statutory duty to take an "acknowledgment." *Id.* at *9-10. In the case of a deed of trust purporting

to encumber real property in Idaho, an unacknowledged deed of trust should not be recorded and is voidable by the Trustee. *Id.,* at *10.

32.     As a direct and proximate result of the foregoing, the Trustee is entitled to an order preserving and avoiding the Deed of Trust for the benefit of Debtors' bankruptcy estate, pursuant to 11 U.S.C. §§ 544(a)(1)-(3), 550, and 551.

## CLAIM 2 - AVOIDANCE OF LIEN

33.     Trustee reasserts all of the foregoing paragraphs as if fully set forth again herein.

34.     For the reasons stated in the above paragraphs, the Deed of Trust is defective.

35.     Trustee, on behalf of the estate, benefits from any defenses available to the Debtors as against the validity of the Deed of Trust. *See* 11 U.S.C. § 558.

36.     On account of these defects, Trustee is entitled to a declaration that the Deed of Trust is invalid as a lien against the Property pursuant to applicable Idaho state law and 11 U.S.C. § 558.

COMPLAINT TO AVOID UNPERFECTED LIEN - 6

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.       On Claim 1, for an order, pursuant to 11 U.S.C. §§ 544 and 550, avoiding and recovering for the bankruptcy estate the Deed of Trust as an unperfected lien on the Property and preserving the lien for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

2.       On Claim 2, for an order, pursuant to 11 U.S.C. § 558, avoiding and/or invalidating the Deed of Trust as faulty under applicable Idaho state law.

3.       For such other and further relief as the Court may deem just and equitable.


DATED this 29th day of July, 2021.

                                                     _____*/s/Kirk J. Houston*_____
                                                     KIRK J. HOUSTON
                                                     Attorney for Trustee

COMPLAINT TO AVOID UNPERFECTED LIEN - 7



EXHIBIT
A

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made and entered into as of the 25 day of May, 2017 (the "Effective Date"), by and between **DA CAPITAL INVESTMENTS, LLC**, an Idaho limited liability company ("Lender") and **C.A.R.S. ENTERPRISES, INC.**, an Idaho corporation ("Borrower"). Lender and Borrower are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

## RECITALS

WHEREAS, Ryan W. Hawkes ("Hawkes") is the President of Borrower and Curtis D. Grieve ("Grieve") is the Vice President of Borrower; and

WHEREAS, Hawkes and Grieve are the directors of Borrower; and

WHEREAS, Hawkes and Grieve each own Fifty Percent (50%) of the issued and outstanding shares of Borrower; and

WHEREAS, Hawkes Motors is an automobile dealership duly licensed under the laws of the State of Idaho as an assumed business name of Borrower; and

WHEREAS, on the 2nd day of May, 2016, Lender and Borrower entered into the Agreement for the Sale and Purchase of Interest in Business ("Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Lender advanced up to Nine Hundred Thousand Dollars and no/100 ($900,000.00) ("First Advance") to Borrower; and

WHEREAS, on the date of the execution of this Agreement, the Parties have agreed that the outstanding principal amount of the First Advance is Seven Hundred Ninety-Six Thousand Six Hundred Eighteen Dollars and 50/100 ($796,618.50); and

WHEREAS, Borrower desires to receive additional advancements to use in its business; and

WHEREAS, Lender desires to lend additional amounts to Borrower to use in its business.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions. In addition to the terms defined above in the introduction and recitals to this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Agreement" means this Loan Agreement, including the Exhibits and schedules that are attached hereto and made a part hereof.

"Borrower" has the meaning set forth in the Preamble.

"Borrower Closing Deliveries" has the meaning set forth in Section 5.4(b).

"Business Day" means any day other than Saturday, Sunday or any federal legal holiday.

"Closing" has the meaning set forth in Section 5.1.

"Closing Date" has the meaning set forth in Section 5.1.

"Collateral Reserve Escrow" has the meaning set forth in Section 3.1.

"Effective Date" has the meaning set forth in the Preamble.

"Escrow Agent" means DA Capital Investments, LLC, an Idaho limited liability company

"First Advance" has the meaning set forth in the Recitals.

"Lender" has the meaning set forth in the Preamble.

"Lender Closing Deliveries" has the meaning set forth in Section 5.4(a).

"Guaranty" has the meaning set forth in Section 2.1.

"Loan" has the meaning set forth in Section 2.1.

"Loan Amount" has the meaning set forth in Section 2.1.

"Loan Documents" has the meaning set forth in Section 2.1.

2

"Mortgage" has the meaning set forth in Section 2.1.

"Monthly Reserve Payment" has the meaning set forth in Section 3.1.

"Note" has the meaning set forth in Section 2.1.

"Notice" has the meaning set forth in Section 6.1(a).

"Party" has the meaning set forth in the Preamble.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Purchase Agreement" has the meaning set forth in the Recitals.

"Second Advance" has the meaning set forth in Section 2.3.

"Stock Pledge" has the meaning set forth in Section 2.1.

"Third Advance" has the meaning set forth in Section 2.4.

## ARTICLE II

## THE LOAN

2.1    Subject to the conditions of this Agreement, on the Closing Date (as defined below), Lender hereby agrees to lend to Borrower, and Borrower agrees to borrow from Lender (the "Loan"), the sum of Two Million Eight Hundred Thousand Dollars and no/100 ($2,800,000.00) (the "Loan Amount") evidenced by a Promissory Note executed by Borrower at the Closing (the "Note") and secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (the "Mortgage") on certain property owned by Borrower, Hawkes, and Grieve, which Note and Mortgage shall be in the forms and on the terms and conditions set forth on Exhibit A and Exhibit B, respectively, attached hereto and made a part hereof. The Loan shall be further secured by a UCC-1 financing statement required by the Mortgage. In consideration for the making of the Loan, Borrower will deliver to Lender fully-executed counterparts of the following documents at Closing: (i) a Stock Pledge Agreement from Hawkes and Grieve in the form of Exhibit C attached hereto (the "Stock Pledge"), and (ii) a Guaranty from Hawkes and Grieve in the form of Exhibit D attached hereto (the "Guaranty"). The Note, Mortgage, Stock Pledge and Guaranty are hereinafter referred to as the "Loan Documents."

2.2    The Parties agree that on the Closing Date Seven Hundred Ninety-Six Thousand Six Hundred Eighteen Dollars and 50/100 ($796,618.00) remains outstanding and due from Borrower to Lender pursuant to the Purchase Agreement and the First Advance. An amount equal to the outstanding amount of the First Advance shall not be advanced pursuant to this Agreement. Rather, any amount of the First Advance that remains outstanding as of the Closing Date shall be deemed repaid by Borrower and relent by the Lender such that repayment

3

of said outstanding amounts shall be governed pursuant to this Agreement and subject to the terms and conditions of the Note. Pursuant to Paragraph 10 of the Purchase Agreement, the deemed repayment of the First Advance shall be considered repayment of the full amount of Lender's initial investment for purposes such that Lender's ownership interest in Borrower is cancelled. In the event that any of the terms of this Agreement conflict with the terms of the Purchase Agreement, this Agreement shall be construed as an amendment to the Purchase Agreement pursuant to Paragraph 13 thereof.

2.3     Lender hereby agrees to advance to Borrower One Hundred Seventy-Five Thousand Dollars and no/100 ($175,000.00) on May 18, 2017 subject to the terms and conditions of the Note ("Second Advance").

2.4     Lender hereby agrees to advance to Borrower One Million Eight Hundred Twenty-Eight Thousand Three Hundred Eighty-One Dollars and 50/100 on May 25, 2017 subject to the terms and conditions of the Note ("Third Advance").

2.5     Borrower hereby agrees to repay any outstanding amounts under the First Advance, the Second Advance, and the Third Advance pursuant to the terms and conditions of the Note.

2.6     Any additional securing of funding via floor plan, capital investment, owner sales to additional persons, entities, etc. by Borrower, whether from Lender or from a third party, shall be agreed to in writing by both Parties.

ARTICLE III

COLLATERAL RESERVE

3.1     Borrower and Lender agree that at Closing an escrow account shall be established ("Collateral Reserve Escrow"), the funds of which shall be held in trust and shall serve as additional collateral securing repayment of the Loan Amount and any penalties, fees, and costs related to this Agreement. Borrower hereby agrees to deposit Seventeen Thousand Dollars and no/100 ($17,000.00) ("Monthly Reserve Payment") with the Escrow Agent on or before the tenth day of each and every calendar month beginning on June 10, 2017, and through and until repayment in full of the Loan, including principal, interest, penalties, fees, and costs. These Monthly Reserve Payments shall not constitute principal payments on the Note. Upon the occurrence of a monetary Event of Default or material non-monetary Event of Default under the Loan Documents, Lender shall be entitled to the immediate disbursement of funds held in the Collateral Reserve Escrow and Lender shall apply the amount so disbursed (i) first, to any and all interest, fees, costs or expenses due and payable under the Loan, and (ii) second, any remaining funds to the principal balance of the Loan. Any funds remaining in the Collateral Reserve Escrow upon repayment in full of the Loan shall be disbursed to Borrower. Upon the expiration of the Loan, Escrow Agent shall apply all funds held in escrow toward repayment of the outstanding principal balance of the Loan.

3.2     Any interest, income, or earnings derived from the Monthly Reserve Payments shall accrue to the benefit of the Lender and shall not be held as trust funds.  Such accrued amounts may be disbursed from the Collateral Reserve Escrow to the Lender at any time.

3.3     Until such time as amounts held in the Collateral Reserve Escrow are disbursed to the Lender or the Borrower, Lender shall reflect such amounts as a liability on its books and Borrower shall reflect such amounts as an asset on its books.

## ARTICLE IV

## COVENANTS AND WARRANTIES

4.1     <u>Lender's Covenants and Warranties</u>.  Lender hereby represents, warrants, and covenants that:

(a) The officer signing below on behalf of the Lender has the authority to enter into this Agreement;

4.2     <u>Borrower's Covenants and Warranties</u>.  Borrower hereby represents, warrants, and covenants that:

(a) The officer signing below on behalf of Borrower has sole authority to enter into this Agreement;

(b) Borrower's dealer license of Hawkes Motors with the Idaho Department of Transportation is valid and in good standing and all title transfers and reports have been filed as required in conjunction with the operation of the automobile dealership.  Borrower further acknowledges that it is its responsibility to maintain such license and reporting current as required by the Idaho Transportation Department.

(c) No judgments, levies, or actions are currently pending against Borrower or Hawkes Motors unless specifically disclosed in an exhibit to be attached hereto and signed by Borrower;

(d) No lawsuits are pending or threatened against borrower or Hawkes Motors related to the operation of Borrower or Hawkes Motors unless specifically disclosed in an exhibit to be attached hereto and signed by both parties;

(e) All required state and federal tax returns for the operation of Borrower or Hawkes Motors have been filed;

(f) No other liabilities exist for Borrower or Hawkes Motors that have not been disclosed to Lender;

(g) Lender shall at all times have the right to inspect the records of Borrower or Hawkes Motors, including, but not limited to financial records, monthly sales records, sales tax reports, the payments history for sales tax, title registration logs and TOD applications as well as Federal and State tax returns.

5

ARTICLE V

LOAN CLOSING

5.1    Closing Date.  The closing of the Loan (the "Closing") shall occur on or before the _25_ day of May, 2017 (the "Closing Date").

5.2    Loan Advances.  The Lender and Borrower agree that the Loan Amount shall be advanced to Borrower in three installments and that the First Advance and the Second Advance shall have been dispersed to Borrower prior to the Closing Date.  The Third Advance shall be dispersed on May 25, 2017.  Notwithstanding the timing of the advances, the First Advance, Second Advance, and Third Advance shall be subject to the terms and conditions of this Agreement upon Closing.

5.3    Establishment of Escrow.  The Lender agrees, at Closing, to establish the Collateral Reserve Escrow account to be held with Escrow Agent to secure the performance of the Borrower's obligations under the Agreement.  The funds shall be held, administered, and disbursed in accordance with Article III hereof.  Further, Borrower agrees to deposit the first Monthly Reserve Payment into the Collateral Reserve Escrow prior to the date set forth in Section 3.1 hereof.

5.4    Closing Deliveries.

(a)    Lender's Deliveries.  At the Closing, Lender shall deliver or cause to be delivered to Borrower all of the documents set forth in this Section 5.4(a), each of which shall have been duly executed by Lender and acknowledged (if required) (the "Lender Closing Deliveries"), as follows:

(i)    Such other documents and instruments as may be reasonably requested by Borrower in order to consummate the transaction described in this Agreement.

(b)    Borrower's Deliveries.  At the Closing, Borrower shall deliver or cause to be delivered to Lender all of the documents set forth in this Section 5.4(b), each of which shall have been duly executed by Borrower (and the other parties thereto) and acknowledged (if required) (the "Borrower Closing Deliveries"), as follows:

(i)    The Note;

(ii)    The Mortgage;

(iii)    The Stock Pledge;

(iv)    The Guaranty;

(v)    Such other documents and instruments as may be reasonably requested by Lender in order to consummate the transaction described in this Agreement.

6

ARTICLE VI

MISCELLANEOUS PROVISIONS

6.1    Notices.

(a) Method of Delivery. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "Notice") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address or facsimile number:

If to Lender:

DA Capital Investments, LLC
c/o Douglas R. Brasher
3059 S. Bear Claw Place
Meridian, ID 83642

If to Borrower:

C.A.R.S. Enterprises, Inc.
c/o Ryan W. Hawkes and Curtis D. Grieve
9393 Fairview Avenue
Boise, ID 83704

(b) Receipt of Notices. All Notices sent by a Party (or its counsel pursuant to Section 6.1(d)) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 6.1(c).

(c) Change of Address. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 6.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 6.1.

(d) Delivery by Party's Counsel. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party.

6.2    Time is of the Essence. Time is of the essence of this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for

7

4818-6634-2472, v. 2

the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

6.3     <u>Assignment</u>. Except as provided above, the Borrower shall assign its rights or obligations under this Agreement or any interest therein to any Person, without the prior written consent of the other Party, which consent may be withheld in such other Party's sole discretion.

6.4     <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Lender, and its respective successors and permitted assigns.  The Lender may assign its rights and obligations upon notice to the Borrower.

6.5     <u>Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

6.6     <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF IDAHO APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY TO THIS AGREEMENT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT.

6.7     <u>Rules of Construction</u>. The following rules shall apply to the construction and interpretation of this Agreement:

(a) Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

(b) All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

(c) The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(d) Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

8

4818-6634-2472, v. 2

(e) The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

(f) The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

(g) The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

6.8     Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

6.9     JURISDICTION AND VENUE. LENDER (FOR ITSELF AND ALL LENDER INDEMNITEES) AND BORROWER (FOR ITSELF AND ALL BORROWER INDEMNITEES) EACH HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION AND CONSENT TO VENUE IN THE STATE OR UNITED STATES COURTS LOCATED IN THE COUNTY WHERE ANY OF THE PROPERTY IS LOCATED IN THE STATE OF IDAHO, AND WAIVES ANY DEFENSE BASED ON FORUM NON CONVENIENS.

6.10     SERVICE OF PROCESS. THE PARTIES AGREE THAT, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SERVICE OF PROCESS SHALL BE EFFECTIVE AS TO A PARTY IF DELIVERY OF ANY COURT DOCUMENTS TO SUCH PARTY IS EFFECTED IN ACCORDANCE WITH SECTION 6.1.

6.11     WAIVER OF TRIAL BY JURY. EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

6.12     Prevailing Party. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement against any other Party, all fees, costs and expenses, including reasonable attorneys' fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

6.13     Incorporation of Recitals, Exhibits and Schedules. The recitals to this Agreement, and all exhibits and schedules referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement.

9

6.14     Entire Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

6.15     Amendments, Waivers and Termination of Agreement. No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

6.16     Execution of Agreement. A Party may deliver executed signature pages to this Agreement by facsimile transmission or portable document format to any other Party, which shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page. The Parties stipulate that facsimile and PDF signatures to this Agreement or any amendment hereto shall be treated as originals for all purposes.

6.17     IDAHO STATUTE OF FRAUDS – NOTICE TO BORROWER. PURSUANT TO IDAHO CODE § 28-2-201, BORROWER IS HEREBY NOTIFIED THAT THE WRITTEN LOAN DOCUMENTS AND OTHER RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY ALLEGED PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

6.18     Confidentiality. The terms and conditions of this Agreement, including the existence of a business relationship between the parties, are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. All signatories, parties, present and future persons having or acquiring any interest in the parties, and guarantors are bound by this agreement of confidentiality. Any disclosure in violation of this section shall be deemed a material breach of this Agreement.

[Remainder of page intentionally left blank;
Signatures on following pages]

IN WITNESS WHEREOF, each Party has caused this Loan Agreement to be executed and delivered in its name by a duly authorized officer or representative.

LENDER:

DA CAPITAL INVESTMENT, LLC,
an Idaho limited liability company

By:_____
Douglas R. Brasher, Manager

BORROWER:

C.A.R.S. ENTERPRISES, INC.,
an Idaho corporation

By:_____
Ryan W. Hawkes, President

11



Exhibit A

**PROMISSORY NOTE**
**(this "Note")**

**$2,800,000.00**                                                    the $\underline{25}$ day of May, 2017

    **FOR VALUE RECEIVED,** the undersigned, C.A.R.S. ENTERPRISES, INC., an Idaho corporation (the "Maker"), promises to pay to the order of DA CAPITAL INVESTMENTS, LLC, an Idaho limited liability company (the "Lender"), at 3059 S. Bear Claw Place, Meridian, ID 83642, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Two Million Eight Hundred Thousand Dollars and no/100 ($2,800,000.00), together with accrued interest, at the rate hereinafter set forth, on the unpaid principal balance of this Note from time to time outstanding (at any given time, the "Principal Balance") until paid in full.

    1.    Interest.

        A.    The Principal Balance shall bear interest at the greater of (i) twelve percent (12%) or (ii) the United States Prime Rate plus seven percent (7%), compounded monthly. The interest rate shall be determined semi-annually on the business days closest to, but not after, June 30th and December 31 of each year.

        B.    Interest for any complete month shall be calculated on the basis of a year consisting of 12 months and 30 days each. Interest for any partial month shall be calculated on the basis of a year consisting of 360 days based on the actual number of delays elapsed.

    2.    Payments/Maturity Date.

    From and after the date hereof, Maker shall pay to Lender on the twenty-fifth day of each calendar month through and including June 25, 2027 (the "Maturity Date") interest only payments equal to the amount of accrued interest for the prior month as set forth in Section 1 hereof, beginning on June 25, 2017. The initial monthly interest payment shall be Twenty-Eight Thousand Dollars and no/100 ($28,000.00), which amount shall be paid monthly until such time as the interest rate is redetermined pursuant to Section 1 hereof. The entire Principal Balance, together with all accrued and unpaid interest thereon, and all other applicable fees and reasonable out of pocket costs and charges, if any, shall be due and payable on the Maturity Date in the original principal amount of Two Million Eight Hundred Thousand Dollars and no/100 ($2,800,000.00) from Maker to the order of Lender. All payments of principal and/or interest hereon shall be payable in lawful money of the United States and in immediately available funds. All payments received hereon shall be applied first to accrued interest, then to current interest, and then to principal. All payments hereunder shall be made without offset, demand, counterclaim, deduction, abatement, defense, or recoupment, each of which Maker hereby waives.

Exhibit A, Page 1

3.     Events of Default.  Any one or more of the following shall constitute an "Event of Default" hereunder:  (i) if a default be made in the payment of any payment due hereunder (or any other note or financing arrangement between Lender and Maker or any affiliate, subsidiary, principal, member or other business partner of Maker); or (ii) if a default shall occur in the performance or observance of any other term, covenant or agreement set forth in this Note or the Deed of Trust (defined below), any other note or deed of trust between Lender and Maker or any affiliate, subsidiary, principal, member or other business partner of Maker, or (iii) if Maker shall fail to make the Monthly Reserve Payment required under that certain loan agreement entered into by and between the parties effective May ___, 2017 (the "Loan Agreement") or breach any other term of the Loan Agreement; and such default shall continue for the longer of the applicable grace period contained therein or a period of fifteen (15) days following written notice from Lender.  Upon any such Event of Default, the entire principal balance hereof, all accrued and unpaid interest thereon, and all other applicable fees, reasonable out of pocket costs and charges, if any, shall at once become due and payable at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to the later exercise thereof or to exercise the same in the event of any subsequent Event of Default.

4.     Default Interest.  Notwithstanding the entry of any decree, order, judgment or other judicial action under, pursuant to, in connection with, or otherwise concerning this Note or any of the Loan Documents (as defined in the Loan Agreement between Lender and Maker dated the _____ day of May, 2017), upon the occurrence of an Event of Default hereunder, or under the Deed of Trust and continuance thereof beyond any applicable grace periods and/or after the maturity of this Note (whether by acceleration, declaration, extension or otherwise), the Maker promises to pay to the Lender whenever demanded by the Lender interest on this Note and all other amounts then and thereafter due and payable hereunder or otherwise under the Deed of Trust from the date of such Event of Default and for so long as such Event of Default continues at a rate per annum equal to the lesser of (i) ten percent (10%) over the interest rate otherwise payable under this Note, or (ii) the maximum rate of interest permitted to be charged by applicable laws or regulation governing this Note until paid, such additional interest to be compounded monthly.

5.     Prepayment.  In the event Maker prepays all or any portion of this Note, or the Loan evidenced hereby, except scheduled monthly interest payments, prior to June 25, 2027, Maker shall pay to Lender a prepayment fee equal to twelve percent (12%) of the principal amount prepaid on the Note divided by twelve and multiplied by the remaining number of months until June 25, 2027.  Any such prepayment of principal shall be applied first to accrued interest and any other sums due hereunder and shall not affect or suspend the remaining installments of principal and interest due pursuant to this Note.

6.     Waiver of Notice.  Maker hereby: (i) waives presentment, demand, protest and notice of presentment, notice of protest and notice of dishonor of this debt and each and every other notice of any kind respecting this Note (except as otherwise expressly provided for herein), (ii) agrees that the holder hereof, at any time or times, without notice to it or its consent, may grant extensions of time, without limit as to the number or the aggregate period of such extensions, for the payment of any principal and/or interest due hereon, and (iii) to the extent not

4818-6634-2472, v. 2

prohibited by law, waives the benefit of any law or rule of law intended for its advantage or protection as an obligor hereunder or providing for its release or discharge from liability hereon, in whole or in part, on account of any facts or circumstances other than full and complete payment of all amounts due hereunder.

7.    <u>Waiver of Jury Trial</u>. **THE LENDER, THE MAKER AND ANY OTHER PARTY LIABLE HEREON IN ANY CAPACITY, WHETHER AS INDORSER, SURETY, GUARANTOR, OR OTHERWISE, EACH WAIVES TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THE LOAN EVIDENCED HEREBY AND/OR THE CONDUCT OF THE RELATIONSHIP BETWEEN THE LENDER, THE MAKER AND/OR ANY OTHER PARTY LIABLE HEREON IN ANY CAPACITY, WHETHER AS INDORSER, SURETY, GUARANTOR, OR OTHERWISE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY MAKER, AND MAKER HEREBY REPRESENTS THAT NO ORAL OR WRITTEN STATEMENTS HAVE BEEN MADE BY ANY PARTY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS STATED EFFECT. MAKER FURTHER REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT COUNSEL OF ITS CHOICE IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH SUCH COUNSEL.**

8.    <u>Cost of Collection</u>. The Maker promises to pay all reasonable out of pocket costs and expenses incurred in connection with collection hereof or in the protection or realization of any collateral now or hereafter given as security for the repayment hereof, including attorneys' fees, upon the occurrence of an Event of Default in the payment of the principal of this Note or interest hereon when due, whether at maturity, as herein provided, or by reason of acceleration of maturity under the terms hereof or under the terms of the Deed of Trust, whether suit be brought or not.

9.    <u>Lender's Rights and Remedies</u>. The failure of the Lender to exercise the option for acceleration of maturity, foreclosing, or either, following any Event of Default as aforesaid or to exercise any other option granted to it hereunder or under the Deed of Trust in any one or more instances, or the acceptance by the Lender of partial payments or partial performance, shall not constitute a waiver of any such Event of Default, but such options shall remain continuously in force. Acceleration of maturity, once claimed hereunder by the Lender, may at its option be rescinded by written acknowledgment to that effect but the tender and acceptance of partial payment or partial performance alone shall not in any way affect or rescind such acceleration of maturity. The rights, remedies and powers of the Lender, as provided in this Note and the Deed of Trust are cumulative and concurrent, and may be pursued singly, successively, or together against the Maker or the Property (as defined below).

10.    <u>Lawful Interest</u>. Notwithstanding anything to the contrary contained herein or in any of the Loan Documents, the effective rate of interest on the obligation evidenced by this Note shall not exceed the lawful maximum rate of interest permitted to be paid. Without limiting the generality of the foregoing, in the event the interest charged hereunder results in an effective

rate of interest higher than that lawfully permitted to be paid, then such charges shall be reduced by the sum sufficient to result in an effective rate of interest permitted by law and any amount which would exceed the highest lawful rate already received and held by the Lender shall be applied to a reduction of principal and not to the payment of interest.

11.    Partial Invalidity.  In the event any one or more of the provisions contained in this Note or the Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note or the Deed of Trust, but this Note and the Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

12.    Entire Agreement.  This Note may not be changed orally, but only by an agreement in writing signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

13.    Security.  This Note is secured by that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (as the same may be amended, restated or modified from time to time, the "Deed of Trust") from the Maker, as trustor, conveying to First American Title Company, an Idaho title company (the "Trustee") certain real property located in Ada County, Idaho and Canyon County, Idaho, as more particularly described therein, together with all improvements now or hereafter located thereon (the "Property").

14.    Business Purpose.  The Maker warrants and represents that the loan evidenced hereby is being made for business or investment purposes.

15.    Governing Law; Jurisdiction; Venue.  This Note and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Idaho applicable to contracts made and performed in such State (without regard to principles of conflict of laws) and any applicable law of the United States of America and shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns.  To the fullest extent permitted by law, Maker hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Note.  Any legal suit, action or proceeding against Maker arising out of or relating to this Note may at Lender's option be instituted in any federal or state court in or having jurisdiction with respect to Ada County, Idaho, and Maker waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Maker hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Nothing herein shall affect the right of Lender to serve process in any manner permitted by law or limit the right of Lender to bring proceedings against Maker in any other court or jurisdiction that Lender may elect in its sole and absolute discretion, and Maker waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and Maker hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Maker hereby waives personal service of process and irrevocably consents to service of process in the manner provided for

Exhibit A, Page 4

notices in Section 16 hereof. Nothing in this Note will affect the right of Lender to serve process in any other manner permitted by law.

      16.    <u>Notice</u>. Any notice or demand required or allowed under this Agreement shall be in writing and may be delivered by (i) registered or certified mail, return receipt requested; (ii) personal delivery by a reputable delivery service; or (iii) overnight delivery such as Federal Express or other similarly reputable carrier, addressed as follows:

    <u>If to Lender:</u>

        DA Capital Investments, LLC
        c/o Douglas R. Brasher
        3059 S. Bear Claw Place
        Meridian, ID 83642

    <u>If to Maker:</u>

        C.A.R.S. Enterprises, Inc.
        c/o Ryan W. Hawkes and Curtis D. Grieve
        9393 Fairview Avenue
        Boise, ID 83704

    **IN WITNESS WHEREOF**, the Maker has executed, sealed and delivered this Note effective as of the day and year first written above.

                    **MAKER:**

                    C.A.R.S. ENTERPRISES, INC.
                    an Idaho corporation

                    By:_____
                          Ryan W. Hawkes, President

STATE OF _____ )
                      : ss.
COUNTY OF _____ )

    On the _____ day of May, 2017, Ryan W. Hawkes, as President of C.A.R.S. Enterprises, Inc., the signer of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that he executed the same.

                    _____
                    NOTARY PUBLIC

Exhibit A, Page 5

notices in Section 16 hereof. Nothing in this Note will affect the right of Lender to serve process in any other manner permitted by law.

16.    Notice. Any notice or demand required or allowed under this Agreement shall be in writing and may be delivered by (i) registered or certified mail, return receipt requested; (ii) personal delivery by a reputable delivery service; or (iii) overnight delivery such as Federal Express or other similarly reputable carrier, addressed as follows:

If to Lender:

    DA Capital Investments, LLC
    c/o Douglas R. Brasher
    3059 S. Bear Claw Place
    Meridian, ID 83642

If to Maker:

    C.A.R.S. Enterprises, Inc.
    c/o Ryan W. Hawkes and Curtis D. Grieve
    9393 Fairview Avenue
    Boise, ID 83704

**IN WITNESS WHEREOF**, the Maker has executed, sealed and delivered this Note effective as of the day and year first written above.

MAKER:

C.A.R.S. ENTERPRISES, INC.
an Idaho corporation

By: _____
    Ryan W. Hawkes, President

STATE OF _Idaho_    )
                : ss.
COUNTY OF _Ada_    )

On the 25 day of May, 2017, Ryan W. Hawkes, as President of C.A.R.S. Enterprises, Inc., the signer of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that he executed the same.

_____
NOTARY PUBLIC

Commission expires
February 1, 2018

Exhibit A, Page 5



2017-056121
RECORDED
12/27/2017 12:21 PM

Exhibit B

**DEED OF TRUST**

003430 15201700561210280287
CHRIS YAMAMOTO
CANYON COUNTY RECORDER
Pgs=28  MBROWN                    $45.00
MTG D OF T
DA CAPITAL INVESTMENTS LLC

Recording requested by,
and after recording, return to:

DA Capital Investments, LLC
c/o Douglas R. Brasher
3059 S. Bear Claw Place
Meridian, Idaho 83642

ADA COUNTY RECORDER Christopher D. Rich     **2017-123413**
BOISE IDAHO    Pgs=28  LISA BATT           12/27/2017 02:21 PM
DA CAPITAL INVESTMENTS LLC                  AMOUNT:$45.00

004473 15201701234 130280283

APN:   Lot 1: Canyon County  R35345-000
       Lot 2: Ada County  R1097050120
       Lot 3: Ada County  R1523650110

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT, AND FIXTURE FILING**

Trustor, collectively:              C.A.R.S. Enterprises, Inc.
                                    Ryan W. Hawkes
                                    Curtis D. Grieve

Trustee:

Beneficiary:                        DA Capital Investments, LLC
                                    an Idaho limited liability company

Property Tax Parcel Number:         Lot 1: Canyon County,  R35345-000
                                    Lot 2: Ada County,  R1097050120
                                    Lot 3: Ada County,  R1523650110

For purposes of Article 9 of the Idaho Uniform Commercial Code, this Security Instrument constitutes a Security Agreement and Financing Statement with Trustor being the Debtor and Beneficiary being the Secured Party.  This Security Instrument shall also constitute a Financing Statement filed as a fixture filing pursuant to Article 9 of the Idaho Uniform Commercial Code.

Exhibit B, Page 1

THIS **DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "Security Instrument") is made as of the 15 day of May, 2017, by C.A.R.S. ENTERPRISES, INC., an Idaho limited liability company, having an address of 9393 Fairview Avenue, Boise ID 83704 ("C.A.R.S."), Ryan W. Hawkes, an individual resident of Ada County, Idaho ("Hawkes"), and Curtis D. Grieve, an individual resident of Ada County, Idaho ("Grieve"), as trusFirst American Title Company, an Idaho title company, as trustee ("Trustee"), having an address of 738 Sout Bridge Way Place suite 150, Eagle, ID 83616, for the benefit of DA Capital Investments, LLC, an Idaho limited liability company, having an address of 3059 S. Bear Claw Place, Meridian, ID 83642, as beneficiary ("Lender")

## RECITALS:

A.     Pursuant to that certain Loan Agreement, dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among C.A.R.S. and Lender, Lender has agreed to make a loan in the principal amount of TWO MILLION EIGHT HUNDRED THOUSAND DOLLARS and no/100 ($2,800,000.00) (the "Loan"); and

B.     Pursuant to a certain Promissory Note, dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note"), executed by C.A.R.S. in favor of Lender, C.A.R.S. has agreed to repay to Lender the amount of the Loan plus certain interest and expenses; and

C.     Pursuant to that certain Indemnity and Guaranty Agreement, dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Guaranty"), executed by Hawkes and Grieve in favor of Lender, Hawkes and Greive have agreed to guaranty repayment of the Loan as additional security to induce Lender to enter into the Loan Agreement; and

D.     This Security Instrument, the Note, the Stock Pledge, the Guaranty, and any of the other documents evidencing or securing the Loan, as amended, supplemented or otherwise modified from time to time, are each referred to as a "Loan Document" and are collectively referred to as the "Loan Documents".

**NOW, THEREFORE,** Trustor, in consideration of the Indebtedness (as hereinafter defined), the Other Obligations (as hereinafter defined) and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, Trustor's interest in the Pledged Property described on **Exhibit A** attached to this Security Instrument.

**TO SECURE TO LENDER,** its successors and assigns, the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, together with the Other Obligations, including without limitation the payment of all sums advanced by or on behalf of Lender to protect the security of this Security Instrument, and the performance of the covenants and agreements of the Borrowers contained in the Loan Documents.

For purposes of Idaho Code § 45-15-1502, et seq., Trustor agrees that all default interest, late charges, Prepayment Premiums, and similar amounts, if any, owing from time to time under the Note, this Security Instrument, and other Loan Documents shall constitute a part of and be entitled to the benefits of Lender's lien upon the Pledged Property and Lender may add all such amounts to the principal balance of the Note, in its sole discretion, and Lender may include such amounts in any credit which Lender may make against its bid at a foreclosure sale of the Pledged Property pursuant to this Security Instrument.

Trustor represents and warrants that Trustor is lawfully seized of the Pledged Property and has the right, power and authority to grant, convey and assign the Pledged Property, and that, other than the Permitted Exceptions the Pledged Property is unencumbered. Trustor covenants that Trustor will warrant and defend generally the title to the Pledged Property against all claims and demands, subject to the Permitted Exceptions.

1. **DEFINITIONS; RECITALS**. Certain terms used in this Security Instrument are defined below and certain other terms used in this Security Instrument are defined elsewhere in this Security Instrument. All recitals to this Security Instrument are hereby incorporated by reference as if expressly set forth herein.

    1.1.   "Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Idaho are authorized or required by law to remain closed.

    1.2.   "Default" means the occurrence of any event, circumstance or condition which constitutes a breach of or a default under any Loan Document and which, after the giving of any required notice and/or the passage of any applicable cure period, would constitute an Event of Default under the Security Instrument or any other Loan Document.

    1.3.   "Default Rate" means a rate per annum equal to the lesser of (i) ten percent (10%) over the interest rate payable under the Note, or (ii) the maximum rate of interest permitted to be charged by applicable laws or regulation governing this Security Instrument until paid, such additional interest to be compounded monthly.

    1.4.   "Event of Default" means the occurrence of any "Event of Default" as defined in the Note, regardless of the cause thereof, or the circumstances giving rise thereto.

    1.5.   "Fixtures" has the meaning given to such term in the definition of "Pledged Property".

    1.6.   "Improvements" has the meaning given to such term in the definition of "Pledged Property."

    1.7.   "Indebtedness" means all present and future indebtedness evidenced by or arising under the Note or under any other Loan Document, together with interest thereon

and all other sums due to Lender in respect of the Loan under any Loan Document (including sums added to the principal balance of the Loan in accordance with the terms of any Loan Document, all Protective Advances, Prepayment Premiums, Past Due Charges, and all other charges, fees, reasonable out of pocket costs and expenses payable pursuant to any Loan Document).

   1.8.   "Leases" means all leases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Trustor (or any predecessor of Trustor, to the extent Trustor or the Pledged Property (hereinafter defined) remain subject thereto), whether made before or after the filing by or against Trustor of any petition for relief under 11 U.S.C. § 101 et seq., as the same may be amended from time to time (the "Bankruptcy Code"), demising, leasing or granting rights of possession or use of all or any portion of the Pledged Property, together with all modifications, extensions or renewals thereof now existing or hereafter permitted under the Loan Documents.

   1.9.   "Loan Document" and "Loan Documents" have the meaning given to such terms in the recitals above.

   1.10.   "Maturity Date" has the meaning given in the Note.

   1.11.   "Pledged Property" means all of Trustor's right, title and interest in: the real property described on **Exhibit A** attached hereto and incorporated herein by reference, together with all buildings and other improvements ("Improvements") now or hereafter located thereon, and any and all right, title or interest in any other real property or improvements comprised in such real property, which right, title or interest is acquired by Trustor after the date of this Security Instrument (such real property, buildings, other Improvements and after-acquired interest being hereinafter collectively referred to as the "Real Property"); the Personal Property; all development rights transferred or appurtenant to the Real Property, all easements and other rights now or hereafter made appurtenant to the Real Property; all additions and accretions to the Real Property; all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Real Property in which Trustor has an interest (the "Fixtures"); all inventory and movable equipment and furniture located on or used in the Trustor's business; all rights in or to existing or future streets or public places; all existing and future minerals, oil, gas and other hydrocarbon substances upon, under or through the Real Property; all water and water rights, pumps and pumping plants, and existing and future water stock relating thereto; all existing and future shares of stock or other evidence of ownership of any part of the foregoing property and all intangible property and rights relating to the foregoing property, or the operation thereof or used in connection therewith, including all options, sales contracts and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements, and those funds escrowed pursuant to that certain Collateral Reserve Escrow created on or about the date hereof by and between Trustor, Lender and the Escrow Agent, and all proceeds of any of the foregoing.  Any reference in this

4818-6634-2472, v. 2

Security Instrument to the "Pledged Property" shall mean the Pledged Property described in this Section, any part thereof, or any interest therein.

1.12.    "Obligations" means the Indebtedness and the Other Obligations, collectively.

1.13.    "Other Obligations" means the performance of all obligations (other than payment of the Indebtedness) of the Borrowers under any of the Loan Documents.

1.14.    "Permitted Discretion" means a determination or judgment made in good faith in the exercise of reasonable (from the perspective of a secured lender) credit or business judgment.

1.15.    "Permitted Exceptions" means and all liens and encumbrances of record.

1.16.    "Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

1.17.    "Personal Property" means all "Accounts", "Cash proceeds", "Chattel paper", "Collateral", "Commercial tort claims", "Deposit accounts", "Documents", "Electronic chattel paper", "Equipment", "Fixtures", "General intangibles", "Goods", "Instruments", "Inventory", "Investment property", "Letter-of-credit rights", "Noncash proceeds", "Payment intangibles", "Proceeds", "Software", "Supporting Obligations", and "Tangible chattel paper", as defined in the Uniform Commercial Code, in which Trustor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Real Property (whether or not subsequently removed from the Real Property (other than that portion of the Pledged Property consisting of the Real Property)), including, without limitation, all (i) machinery and tools; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, storm windows, storm doors, venetian blinds, curtains, and curtain rods; (iv) mirrors, lamps, chandeliers and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment; (vii) systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light, potted plants, heating, lighting and plumbing fixtures, fire detection, prevention and extinguishing apparatus, elevators, escalators, fittings, plants, apparatus, water heaters, stoves, ranges, refrigerators, microwave ovens, tools, machinery, engines, dynamos, motors, boilers, incinerators, conduits, compressors, brackets, electrical signs, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, dishwashers, garbage disposals, laundry machines, washers and dryers, telephone systems and equipment, exercise equipment, security and access control systems and apparatuses; (viii) beds, bureaus, chiffoniers, chests, chairs, desks, mirrors, bookcases, tables, screens, paintings, hangings, pictures, objects of art, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets,

glassware, food carts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, facsimile machines, medical equipment, switchboards, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, and other customary hotel equipment; (ix) rights, royalties, Rents, Rooms Revenues, security deposits, advance rentals, revenues, profits and benefits, credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities and parking charges, the rendering of services by Trustor or any operator or manager of a hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores and offices, and deposits securing reservations of such space), license, lease, sublease, concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and any other items of revenue, receipts and/or income as identified in the Uniform System of Accounts for Hotels, 10th Edition, International Association of Hospitality Accountants (2006), as from time to time amended); (x) Leases, lease guarantees, contracts, contract rights, franchise agreements, licenses, permits and certificates; (xi) deposits, funds, money and deposit accounts; (xii) tenements, hereditaments and appurtenances; (xiii) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xiv) names under or by which the Pledged Property or any of the Improvements may at any time be operated or known and rights to carry on business under any such names or any variant thereof; (xv) trademarks, other intellectual property and good will, websites, URLs, blogs, and social network pages; (xvi) management agreements, service contracts, supply contracts or other contracts or agreements; (xvii) warranties; (xviii) water stock; (xix) shares of stock or other evidence of ownership of any part of the Pledged Property or Improvements that is owned by Trustor in common with others, and all documents of membership in any owners' or members' association or similar group having responsibility for managing, maintaining or operating any part of the Pledged Property or Improvements; (xx) plans and specifications prepared for construction of Improvements on the Pledged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Pledged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Trustor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Pledged Property; (xxi) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any Borrowers of any part of the Pledged Property and other proceeds of the sale thereof; (xxii) damages, royalties and revenue of every kind, nature and description whatsoever that Trustor may be entitled to receive from any person or entity owning or having or hereafter acquiring a right to the oil, gas or mineral rights and reservations of the Pledged Property; (xxiii) deposits made with or other security given to utility companies by Trustor with respect to the Pledged Property and/or Improvements; (xxiv) advance payments of insurance premiums made by Trustor

Exhibit B, Page 6

with respect to, and all claims or demands with respect to, insurance; (xxv) negotiable certificates of deposit of Trustor in Lender's possession and all accounts of Trustor maintained with Lender and each deposit account of Trustor assigned or pledged to Lender pursuant to any agreement; (xxvi) insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xxvii) condemnation awards; (xxviii) causes of action, claims, compensation, awards and recoveries for any damage or injury to the Pledged Property and/or Improvements or for any loss or diminution in value of the Pledged Property and/or Improvements; (xxix) books and records, including, without limitation, all computer records, computer tapes and electronic and electromagnetic representations and reproductions thereof;  (xxx) guaranties of and security for any of the foregoing; (xxxi) [intentionally omitted]; (xxxii) all substitutions, renewals, improvements, attachments, accessions, additions and replacements to any of the foregoing; and all "Proceeds" (as such term is defined in the Uniform Commercial Code), collections, insurance proceeds and products of any of the property listed in (i) through (xxxii) above, proceeds of any voluntary or involuntary disposition or claim respecting any part thereof (pursuant to judgment, condemnation award or otherwise) and all documents, instruments, general intangibles, goods, equipment, inventory, chattel paper, monies, accounts, deposit accounts and other personal property that may arise from the sale or disposition of any of the foregoing, all guaranties of and security for any of the foregoing, and all books and records, including, without limitation, all computer records, computer tapes and electronic and electromagnetic representations and reproductions thereof, relating to any of the foregoing.

       1.18.  "Real Property" has the meaning given to such term in the definition of Pledged Property.

       1.19.  "Rents" means all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Trustor, any Property Manager, any of their Affiliates, or any of their agents or employees, from any and all sources arising from or attributable to the Pledged Property, including all credit card receipts collected from tenants, parking charges, and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Pledged Property, service charges, vending machine sales, laundry charges and any other items of revenue, receipts and/or income and proceeds, if any, from business interruption or other loss of income insurance, whether paid or accruing before or after the filing by or against Trustor of any petition for relief under the Bankruptcy Code.

       1.20.  "Room Revenues" means revenues, income, fees, receivables, receipts, deposits, accounts, cash, issues, profits, charges for services  rendered, and any other payment and consideration of whatever form or nature received by or paid to or for the

account of Trustor, any Property Manager, any of their Affiliates, or any of their agents or employees, from any and all sources arising from or attributable to the Pledged Property, including but not limited to, the rental of lodging units, catering services, parking charges, service charges, vending machine sales, laundry charges and any other items of revenue, receipts and/or income and proceeds related thereto.

1.21. "Uniform Commercial Code" means the Uniform Commercial Code as enacted in the State of Idaho, as amended from time to time.

2. **ASSIGNMENT OF RENTS**. Trustor absolutely, unconditionally and irrevocably assigns to Lender, its successors and assigns, the Leases and the Rents. This assignment is an absolute and present assignment from Trustor to Lender and not merely the passing of a security interest. Notwithstanding the immediately preceding sentence, Lender confers upon Trustor the license to collect and retain the Rents as they become due and payable and otherwise deal with the Leases, subject, however, to the right of Lender to revoke such license at any time an Event of Default exists, in its sole discretion and without notice to Trustor. Lender shall have the absolute right to revoke such authority and collect and retain the Rents without taking possession of all or any part of the Pledged Property. The right to collect Rents herein provided shall not cause Lender to be a "mortgagee in possession" for any purpose, nor shall such right impose upon Lender the duty to produce Rents or maintain the Pledged Property in whole or in part. Possession of the Pledged Property by a receiver appointed by a court of competent jurisdiction shall not be considered possession of the Pledged Property by Lender for purposes hereof. During the existence of an Event of Default, Lender may apply, in its sole discretion and in any order of priority, any Rents collected against the reasonable out of pocket costs of collection and any Indebtedness arising under the Loan Documents. Collection of any Rents shall not cure or waive any Event of Default or notice of Event of Default, or invalidate any acts done pursuant to such notice.

3. **SECURITY AGREEMENT AND FIXTURE FILING**.

3.1. **Grant of Security Interest**. Trustor hereby grants to Lender, its successors and assigns, a security interest in the Personal Property to secure all of the Obligations. This Security Instrument constitutes a security agreement with respect to all personal property in which Lender is granted a security interest hereunder, and Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as well as all other rights and remedies available at law or in equity.

3.2. **Perfection**. Trustor will execute, acknowledge, deliver and cause to be recorded or filed, in the manner and place required by any present or future law, any instrument that may be requested by Lender in its Permitted Discretion to publish notice or protect, perfect, preserve, continue, extend, or maintain the security interest and lien, and the priority thereof, of this Security Instrument or the interest of Lender in the Pledged Property, including, without limitation, deeds of trust, security agreements, financing statements, continuation statements, and instruments of similar character, *provided, that*, Trustor shall not be obligated to amend this Security Instrument or any of the other Loan Documents to increase Trustor's liability or to increase Trustor's obligations under the Loan Documents, and, *provided further that*, Trustor shall pay or

4818-6634-2472, v. 2

cause to be paid (i) all filing and recording taxes and fees incident to each such filing or recording, (ii) all expenses, including without limitation, reasonable actual attorneys' fees and costs, incurred by Lender in connection with the preparation, execution, and acknowledgement of all such instruments, and (iii) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of such instruments. Trustor hereby consents to, and hereby ratifies, the filing of any financing statements relating to the Loan made prior to the date hereof. Trustor hereby irrevocably constitutes and appoints Lender as the attorney-in-fact of Trustor, to execute, deliver and, if appropriate, file with the appropriate filing officer or office any such instruments if Trustor should fail to do so within ten (10) days of written demand by Lender. In addition, Trustor irrevocably authorizes Lender to file such continuation statements and other similar documents as it determines, in its sole opinion, are appropriate to protect and perfect its rights under this Security Instrument.

       3.3.  **Place of Business**. Trustor maintains a place of business, as set forth as the address of Trustor in the first paragraph above the Recitals, and Trustor will notify Lender in writing of any change in its place of business within ten (10) days of such change. Trustor is organized under the laws of the State of Idaho.

       3.4.  **Fixtures**. This Security Instrument is also to be recorded as a "fixture filing" in accordance with Idaho Code § 28-9-502, and covers goods that are or are to become Fixtures.

4.  **COVENANTS**. Trustor covenants and agrees that:

       4.1.  **Performance of Obligations**. Trustor shall promptly pay when due the Indebtedness and shall perform and comply with in a timely manner all Other Obligations.

       4.2.  **Title**. Trustor warrants and represents that (a) Trustor lawfully holds fee simple title to the Real Property and title to all other Pledged Property and has the right to encumber the same; (b) the person executing this Security Instrument on behalf of Trustor has the full right, power and authority to do so on behalf of Trustor; (c) this Security Instrument, as so executed and delivered, is a valid and fully binding obligation of Trustor, enforceable in accordance with its terms (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally); and (d) Trustor has reviewed, approved, and been fully advised with respect to this Security Instrument, the Loan, the Loan Documents, and any other document or instrument executed and delivered in connection therewith or as security therefor.

       4.3.  **Incorporation by Reference**. All the covenants, conditions and agreements contained in the Note and all and any of the other Loan Documents, to the extent applicable to Trustor or the Pledged Property, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. In the event of any inconsistency between the provisions of this Security

Exhibit B, Page 9

Instrument or any of the other Loan Documents and the provisions of the Note, the provisions of the Note shall control.

4.4.    **Insurance.**  Trustor shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Trustor and the Pledged Property as required by Lender, which insurance shall be consistent with insurance maintained for similar properties in the Boise, Idaho region of comparable quality and use.

4.5.    **Maintenance of Pledged Property**.  Trustor shall cause the Pledged Property to be maintained in a good and safe condition and repair.  The Improvements, the Fixtures and the Personal Property shall not be removed, demolished or materially altered without the consent of Lender, except for replacements of items of Personal Property in the ordinary course of business with items of Personal Property of similar utility and of equal or greater value.  Trustor shall promptly repair, replace or rebuild any part of the Pledged Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any condemnation.

4.6.    **Waste**.  Trustor shall not commit or suffer any physical waste of the Pledged Property or make any change in the use of the Pledged Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Pledged Property, or take any action that is reasonably likely to invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Pledged Property or the security of this Security Instrument.  Trustor will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

4.7.    **Performance of Other Agreements**.  Trustor shall observe and perform each and every term, covenant and provision to be observed or performed by Trustor pursuant to the any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Pledged Property and any amendments, modifications or changes thereto.

4.8.    **Change of Name, Identity or Structure**.  Trustor shall not change Trustor's name, identity (including its trade name or names) or its structure as a corporation without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change, without first obtaining the prior written consent of Lender.  Trustor hereby authorizes, prior to or contemporaneously with the effective date of any such change, any financing statement or amendment to financing statement required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Trustor shall execute a certificate in form satisfactory to Lender in its Permitted Discretion listing the trade names under which Trustor intends to operate the Pledged Property, and representing and warranting that Trustor does business under no other trade name.

4818-6634-2472, v. 2

4.9. **Mechanics Liens.** If Lender or its title insurer determines that a preliminary notice has been filed in the State Construction Registry prior to the time of the recording of this Security Instrument, Trustor covenants and agrees to cause the lien claimant that filed such preliminary notice to withdraw the preliminary notice and Trustor shall provide to Lender written evidence acceptable to Lender and its title insurer that the lien claimant has accepted payment in full for construction services that the claimant furnished before the recording of this Security Instrument pursuant to Idaho law.

4.10. **Contest of Liens.** Trustor may contest any lien, encumbrance or other charge on the Pledged Property so long as Trustor previously records a notice of release of lien and substitution of alternate security as contemplated by Chapter 5 of Title 45 of the Idaho Statutes and otherwise complies with the requirements of that Chapter to release the Pledged Property from such lien or claim. If Trustor shall fail to remove and discharge any such lien, encumbrance or charge, then, in addition to any other right or remedy of Lender, Lender may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the release of the Pledged Property from the effect of such lien, encumbrance or charge by obtaining a bond in the name of and for the account Trustor of and recording a notice of release of lien and substitution of alternate security in the name of Trustor, each as contemplated by Chapter 5 of Title 45 of the Idaho Statutes or other applicable law, or otherwise by giving security for such claim. Trustor shall, immediately upon demand therefor by Lender, pay to Lender an amount equal to all reasonable out of pocket costs and expenses incurred by Lender in connection with the exercise by Lender of the foregoing right to discharge any such lien, encumbrance or charge, including reasonable out of pocket costs of any bond or additional security, together with interest thereon from the date of such expenditure at the Default Rate.

5. **DEFAULT PROVISIONS.**

5.1. **Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default (regardless of the pendency of any proceeding which has or might have the effect of preventing Trustor from complying with the terms of this Security Instrument), and in addition to such other rights as may be available under any other Loan Document or under applicable law, but subject at all times to any mandatory legal requirements:

5.1.1. <u>Acceleration</u>. Lender may declare the Indebtedness to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without other notice or demand of any kind.

5.1.2. <u>Uniform Commercial Code</u>. Lender shall, with respect to the Personal Property, have all the rights, options and remedies of a secured party under the Uniform Commercial Code, including without limitation, the right to the possession of any such property or any part thereof, and the right to enter with legal process any premises where any such property may be found. Any requirement of the Uniform Commercial Code for reasonable notification shall be met by mailing

written notice to Trustor at its address set forth in the first paragraph above the Recitals hereof at least ten (10) days prior to the sale or other event for which such notice is required. Any such sale may be held as part of and in conjunction with any foreclosure sale of the other properties and rights constituting the Pledged Property in order that the Pledged Property, including the Personal Property, may be sold as a single parcel if the Lender elects. The Trustor hereby agrees that if the Lender demands or attempts to take possession of the Personal Property or any portion thereof in exercise of its rights and remedies hereunder, the Trustor will promptly turn over and deliver possession thereof to the Lender, and the Trustor authorizes, to the extent the Trustor may now or hereafter lawfully grant such authority, the Lender, its employees and agents, and potential bidders or Borrowers to enter upon the Real Property or any other common area, residence, office, building or property where the Personal Property or any portion thereof may at the time be located (or believed to be located) and the Lender may (i) remove the same therefrom or render the same inoperable (with or without removal from such location); (ii) repair, operate, use or manage the Personal Property or any portion thereof; (iii) maintain, repair or store the Personal Property or any portion thereof; (iv) view, inspect and prepare the Personal Property or any portion thereof for sale, lease or disposition; (v) sell, lease, dispose of or consume the same or bid thereon; or (vi) incorporate the Personal Property or any portion thereof into the Real Property and sell, convey or transfer the same. The expenses of retaking, selling and otherwise disposing of the Personal Property, including reasonable attorneys' fees and legal expenses incurred in connection therewith, shall constitute additional Obligations hereunder and shall be payable upon demand, with interest thereon at the Default Rate from the date of demand until paid.

      5.1.3.    <u>Foreclosure Sale</u>. Lender may invoke the power of sale and any other remedies permitted by Idaho law or provided in this Security Instrument or in any other Loan Document. Trustor acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all reasonable out of pocket costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports. If the power of sale is invoked, for any sale under the power of sale granted by this Security Instrument, Lender or Trustee shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Pledged Property to be sold and shall record such notice in each county in which the Pledged Property is located. Lender or Trustee shall mail notice of default in the manner provided by the laws of Idaho to Trustor and to such other persons as the laws of Idaho prescribe. Trustee shall give public notice of sale and shall sell the Pledged Property according to the laws of Idaho. Trustor acknowledges that the power of sale granted by this Security Instrument may be exercised by Lender without prior judicial hearing. Trustor has the right to bring an action to assert the non-existence of an Event of Default or any other defense of Trustor to acceleration and sale. Lender shall be entitled to collect all reasonable out of pocket costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees and costs of documentary evidence, abstracts

4818-6634-2472, v. 2

and title reports. Trustee may sell the Pledged Property at the time and place and under the terms designated in the notice of sale in one or more parcels. Trustee may postpone sale of all or any part of the Pledged Property by public announcement at the time and place of any previously scheduled sale in accordance with the laws of Idaho. Lender or Lender's designee may purchase the Pledged Property at any sale. If the Pledged Property includes several lots or parcels, Trustor has the right, under Idaho law, if present at the sale, to direct the order in which the Pledged Property shall be sold, and Trustee shall follow such directions.  With respect to such lots or parcels, Lender in its discretion may elect to sell all of them as an entirety or may elect to sell a portion of such lots or parcels, in which case the lien of this Security Instrument shall remain in full force and effect with respect to the remaining lots or parcels in accordance with the laws of Idaho.  The Pledged Property, real, personal and mixed, may be sold in one parcel.  To the extent any of the Pledged Property sold by the Trustee is personal property, then Trustee shall be acting as the agent of the Lender in selling such Pledged Property.  Any person permitted by law, including Lender, may purchase such Pledged Property at any sale, and Lender may credit its bid price against the amounts due to Lender under the Loan Documents in lieu of the payment of cash.  Upon any sale, Trustee will execute and deliver to the Borrower or Borrowers a deed or deeds conveying the Pledged Property sold, but without any covenant or warranty, express or implied, and the recitals in the Trustee's deed showing that the sale was conducted in compliance with all the requirements of law shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide Borrowers and encumbrancers for value.

       5.1.4.   <u>Appointment of Receiver</u>.  Lender shall, as a matter of right, without notice and without giving bond to Trustor or anyone claiming by, under or through Trustor, and without regard to the solvency or insolvency of Trustor or the then value of the Pledged Property, be entitled to have a receiver appointed pursuant to applicable law of all or any part of the Pledged Property, the Rents and the Room Revenues, with such power as the court making such appointment shall confer, and Trustor hereby consents to the appointment of such receiver and shall not oppose any such appointment.  Any such receiver may, to the extent permitted under applicable law, without notice, enter upon and take possession of the Pledged Property or any part thereof by summary proceedings, ejectment or otherwise, and may remove Trustor or other persons and any and all property therefrom, and may hold, operate and manage the same and receive all Rents and Room Revenues accruing with respect thereto or any part thereof, whether during the pendency of any foreclosure or until any right of redemption shall expire or otherwise.  Trustor agrees to promptly deliver to any such receiver all Leases, Rents, Room Revenues, documents, financial data and other information requested by such receiver in connection with the Pledged Property and, without limiting the foregoing, Trustor hereby authorizes Lender to deliver to any such receiver any or all of the Leases, Rents, Room Revenues, documents, data and information in Lender's possession relating to the Pledged Property.

Exhibit B, Page 13

5.1.5.    <u>Taking Possession of, Collecting Rents, Collecting Room Revenues, Etc.</u>  Upon demand by Lender, Trustor shall surrender to Lender and Lender may enter and take possession of the Pledged Property or any part thereof personally, by its agent or attorneys or be placed in possession pursuant to court order as "mortgagee in possession" or receiver as provided under applicable law, and Lender, in its discretion, personally, by its agents or attorneys or pursuant to court order as "mortgagee in possession" or receiver as provided under applicable law may enter upon and take and maintain possession of all or any part of the Pledged Property, together with all documents, books, records, papers, and accounts of Trustor relating thereto, and may exclude Trustor and any agents and servants thereof wholly therefrom and may, on behalf of Trustor, or in its own name as Lender and under the powers herein granted:

(a)    hold, operate, manage and control all or any part of the Pledged Property and conduct the business, if any, thereof, either personally or by its agents, with full power to use such measures, legal or equitable, as in its discretion may be deemed proper or necessary to enforce the payment or security of the Rents or Room Revenues of the Pledged Property, including without limitation actions for recovery of rent, actions in forcible detainer, and actions in distress for rent, all without notice to Trustor;

(b)    cancel or terminate any Lease or sublease of all or any part of the Pledged Property for any cause or on any ground that would entitle Trustor to cancel the same;

(c)    elect to disaffirm any Lease or sublease of all or any part of the Pledged Property made subsequent to this Security Instrument without Lender's prior written consent;

(d)    extend or modify any then-existing Leases and make new Leases of all or any part of the Pledged Property, which extensions, modifications, and new Leases may provide for terms to expire, or for options to lessees to extend or renew terms to expire, beyond the Maturity Date and the issuance of a deed or deeds to a Borrower or Borrowers at a foreclosure sale, it being understood and agreed that any such Leases, and the options or other such provisions to be contained therein, shall be binding upon Trustor, all persons whose interests in the Pledged Property are subject to the lien hereof, and the Borrower or Borrowers at any foreclosure sale, notwithstanding any redemption from sale, discharge of the Obligations, satisfaction of any foreclosure decree, or issuance of any certificate of sale or deed to any such Borrower;

(e)    make all necessary or proper repairs, decoration renewals, replacements, alterations, additions, betterments, and improvements in connection with the Pledged Property as may seem judicious to Lender, to insure and reinsure the Pledged Property and all risks incidental to Lender's possession, operation and management thereof, and to receive all Rents and Room Revenues therefrom;

(f)      apply the net income, after allowing a reasonable fee for the collection thereof and for the management of the Pledged Property, to the payment of taxes, premiums and other charges applicable to the Pledged Property, or in reduction of the Obligations in such order and manner as Lender shall select; and

(g)      receive and collect the Rents and Room Revenues personally or through a receiver so long as an Event of Default shall exist and during the pendency of any foreclosure proceedings and during any redemption period, and the Trustor agrees to consent to a receiver if this is believed necessary or desirable by the Lender to enforce its rights under this subsection.   The collection of Rents or Room Revenues by the Lender shall in no way waive the right of the Lender to foreclose this Security Instrument in the event of any said Event of Default

(h)      Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the actual taking of possession of the Pledged Property.  The right to enter and take possession of the Pledged Property and use any Personal Property therein, to manage, operate, conserve and improve the same, and to collect the Rents and Room Revenues, shall be in addition to all other rights or remedies of Lender hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof.    The expenses (including any receiver's fees, reasonable counsel fees, reasonable out of pocket costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby which expenses Trustor promises to pay upon demand together with interest thereon at the Default Rate from the date of demand until paid.  Lender shall not be liable to account to Trustor for any action taken pursuant hereto other than to account for any Rents or Room Revenues actually received by Lender.  Without taking possession of the Pledged Property, Lender may, in the event the Pledged Property becomes vacant or is abandoned, take such steps as it deems appropriate to protect and secure the Pledged Property (including hiring watchmen therefor) and all reasonable out of pocket costs incurred in so doing shall constitute additional Obligations payable upon demand with interest thereon at the Default Rate from the date of demand until paid.

5.1.6.    Exercise Other Rights and Remedies.   To exercise or invoke any and all other rights and remedies as may be available to Lender now or hereafter at law or in equity.

5.1.7.    Indemnity.    The Trustor hereby agrees to indemnify, defend, protect and hold harmless the Lender and its employees, officers and agents from and against any and all liabilities, claims and obligations which may be incurred, asserted or imposed upon them or any of them as a result of or in connection with any use, operation, lease or consumption of any of the Pledged Property, or any part thereof, or as a result of the Lender seeking to obtain performance of any of the obligations due with respect to the Pledged Property, except from such liabilities, claims or obligations as result from the gross negligence or intentional misconduct of the Lender, its employees, officers or agents.

Exhibit B, Page 15

5.1.8.    To the extent permitted by law, no action taken, or right or remedy invoked, by Lender under this Section 5, including the appointment of a receiver for the Pledged Property, or the entry into possession of the Pledged Property, or any part thereof, by such receiver, or otherwise, shall be deemed to make Lender a "mortgagee in possession" or otherwise responsible or liable in any manner with respect to the Pledged Property, or the use, occupancy, enjoyment or operation of all or any part thereof. In no event shall Lender be required to accept a cure of any default beyond the applicable grace, notice and cure periods provided in the Loan Documents, if any, notwithstanding any statement or provision to the effect that rights or remedies are available while an Event of Default "exists", "continues" or is "outstanding", or during the "existence" or "continuation" of an Event of Default (or any similar statement or provision) in any of the Loan Documents, or anything else in the Loan Documents.

5.2.    **Payment of Costs, Expenses and Attorneys' Fees.** All reasonable out of pocket costs and expenses incurred by Lender pursuant to Section 5 (including court costs and reasonable attorneys' fees and costs of outside counsel, whether or not incurred in litigation and whether or not foreclosure is concluded, including, without limitation, reasonable attorneys' fees and costs of outside counsel incurred in connection with any judicial or nonjudicial foreclosure of this Security Instrument or the other Loan Documents, or in connection with both judicial and nonjudicial foreclosure, if Lender shall elect to pursue each such remedy whether concurrently or independently and reasonable attorneys' fees and reasonable out of pocket costs of outside counsel of Lender) shall be secured by this Security Instrument and shall bear interest at the Default Rate, from the date of expenditure until such sums have been paid. Lender shall be entitled to bid, at any sale of the Pledged Property held pursuant to Section 5.1.2 above, the amount of all such reasonable out of pocket costs, expenses, and interest in addition to the amount of all Other Obligations by a credit bid as the equivalent of cash.

5.3.    **Protective Advances.**

5.3.1.    Advances, disbursements and expenditures made by Lender for the following purposes after the occurrence and during the continuance of an Event of Default, whether before and during a foreclosure, and at any time prior to sale, and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, shall, in addition to those otherwise authorized by this Security Instrument, constitute "Protective Advances":

(a)    all advances by Lender in accordance with the terms of this Security Instrument to: (A) preserve or maintain, repair, restore or rebuild the Improvements upon the Pledged Property; (B) preserve the lien of this Security Instrument or the priority thereof; or (C) enforce this Security Instrument;

(b)    payments by Lender of: (i) when due, installments of principal, interest or other obligations; (ii) when due, installments of real estate taxes and assessments, general and special and all other taxes and assessments of any kind or nature whatsoever which are assessed or imposed upon the mortgaged real estate or any part thereof; (iii) other obligations

authorized by this Security Instrument; or (iv) any other amounts in connection with other liens, encumbrances or interests reasonably necessary to preserve the status of Lender as holder of a first priority lien on the Real Property;

(c)    advances by Lender in settlement or compromise of any claims asserted by claimants under senior mortgages or any other prior liens;

(d)    reasonable attorneys' fees and other reasonable out of pocket costs incurred:  (i) in connection with the foreclosure of this Security Instrument; (ii) in connection with any action, suit or proceeding brought by or against the Lender for the enforcement of this Security Instrument or arising from the interest of the Lender hereunder; or (iii) in the preparation for the commencement or defense of any such foreclosure or other action;

(e)    advances of any amount required to make up a deficiency in deposits for installments of taxes and assessments and insurance premiums as may be authorized by this Security Instrument;

(f)    expenses incurred and expenditures made by Lender for any one or more of the following:  (i) premiums for casualty and liability insurance paid by Lender whether or not Lender or a receiver is in possession, if reasonably required, in reasonable amounts, and all renewals thereof; (ii) repair or restoration of damage or destruction in excess of available insurance proceeds or condemnation awards; (iii) payments required or deemed by Lender to be for the benefit of the Pledged Property under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the mortgaged real estate; (iv) shared or common expense assessments payable to any association or corporation in which the owner of the mortgaged real estate is a member in any way affecting the mortgaged real estate; or (v) pursuant to any lease or other agreement for occupancy of the mortgaged real estate;

5.3.2.    All Protective Advances shall be additional Obligations, and shall become immediately due and payable upon demand and with interest thereon from the date of the demand until paid at the Default Rate.

5.3.3.    This Security Instrument shall be a lien for all Protective Advances as to subsequent Borrowers and judgment creditors from the time this Security Instrument is recorded.

5.3.4.    All Protective Advances shall apply to and be included in:

(a)    determination of the amount of the Obligations at any time;

(b)    the Indebtedness found due and owing to the Lender in the judgment of foreclosure and any subsequent supplemental judgments, orders, adjudications or findings by the court of any additional Indebtedness becoming due after such entry of judgment, it being agreed that in any foreclosure judgment, the court may reserve jurisdiction for such purpose;

Exhibit B, Page 17

(c)    application of income in the hands of any receiver or Lender in possession; and

(d)    computation of any deficiency judgment pursuant to applicable law.

5.4.    **Remedies Cumulative; No Waiver.**  All rights and remedies of Lender hereunder and under the other Loan Documents are cumulative and not alternative, and are in addition to all rights and remedies otherwise provided by law, and any or all of such rights and remedies shall be concurrent and may be pursued singly, successively or together against Trustor, the Borrowers, any other Borrower Party, the Pledged Property, any other collateral securing the Obligations, or any other Persons who are, or may become liable for all or any part of the Obligations, and any other funds, property or security held by Lender for the payment hereof, or otherwise, at the sole and absolute discretion of Lender.  No exercise of any right or remedy by Lender shall constitute a waiver of any other right or remedy.  No delay or omission by Lender to exercise any right, power or remedy hereunder shall impair any such right or remedy, or be construed as a waiver of any Event of Default, or any acquiescence therein.  Without limiting the generality of the foregoing, Trustor agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action," "anti-deficiency" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Pledged Property, this Security Instrument has been foreclosed, or the Pledged Property has been sold and/or otherwise realized upon in satisfaction of the Indebtedness or the Indebtedness has been paid in full, whichever is later.  Nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any particular portion of the Pledged Property for the satisfaction of any of the Obligations in preference or priority to any other portion of the Pledged Property, and Lender may seek satisfaction out of the entire Pledged Property or any part thereof, in its sole and absolute discretion, in respect of the Obligations.  By accepting payment of any part of the Indebtedness after its due date or later performance of any Obligation, Lender shall not waive its right against any Person obligated directly or indirectly under the Loan Documents or this Security Instrument, or on any Obligation, either to require prompt payment when due of all other Indebtedness or to declare an Event of Default for failure to make such prompt payment or render such performance; and Lender's acceptance of partial payment of any portion of the Indebtedness after its due date (which may be applied to such outstanding payment obligations as Lender may elect, notwithstanding Trustor's instructions to the contrary), or acceptance of partial performance of any Obligation in default, shall not cure such payment failure or default, or affect any notice of an Event of Default or sale heretofore given or recorded, unless such notice is expressly revoked in writing by Lender.

5.5.    **Releases, Extensions, Modifications and Additional Security.**  Without affecting the liability of any Person for payment of the Indebtedness, or the lien or priority of this Security Instrument or any other Loan Document upon the Pledged Property, Lender may, in its sole and absolute discretion, from time to time, with or

Exhibit B, Page 18

without notice, do one or more of the following: release the liability of any person for the payment of all or any portion of the Indebtedness; make any agreement or take any action extending the maturity or otherwise altering the terms or increasing the amount of all or any portion of the Indebtedness; and accept additional security, or release all or a portion of the Pledged Property and other security held to secure the Indebtedness. If Lender holds any other or additional security for the payment of the Indebtedness or performance of any Other Obligation, then any sale or foreclosure of such security upon any Event of Default, in the sole discretion of Lender, may be prior to, subsequent to, or contemporaneous with, any sale or foreclosure hereunder and any property in which Lender holds a security interest may be sold as a unit with the Pledged Property.

     5.6.   **Waiver of Right to Redeem - Waiver of Appraisement, Valuation, Etc.** To the extent permitted by law, Trustor waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Pledged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Security Instrument, (iii) all rights and remedies which Trustor may have or be able to assert by reason of the laws of the State of Idaho pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce the Notes or any other obligation secured by this Security Instrument, and (v) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order. Lender shall have the right to determine the order in which any or all of the Pledged Property shall be subjected to the remedies provided by this Security Instrument. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided by this Security Instrument.

## 6. <u>**MISCELLANEOUS**</u>.

     6.1.   **Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (iv) one (1) Business Day after delivery if sent by email, provided that the recipient has acknowledged receipt by telephone and that a carbon copy of such notice is sent simultaneously by the other methods provided in this Section. All notices or other written communications hereunder shall be addressed to the individuals at the addresses set forth below, or at such other address as such party may, at least ten (10) days in advance, designate by written notice to the other parties.

To Trustor:            C.A.R.S. Enterprises, Inc.
                    c/o Ryan W. Hawkes and Curtis D. Grieve
                    9393 Fairview Avenue

Boise, Idaho 83704

And

Ryan W. Hawkes
1450 E. Covey Run Ct.
Eagle, Idaho 83616

And

Curtis D. Grieve
623 N. Cove Colony Way
Eagle, Idaho 83616

To Lender:          DA Capital Investments, LLC
                    c/o Douglas R. Brasher
                    3059 S. Bear Claw Place
                    Meridian, ID 83642

To Trustee:         First American Title Company
                    738 South Bridge Way Place Suite 150
                    Eagle, ID 83616

6.2.    **Time of the Essence.**  Time is of the essence with respect to this Security Instrument and the other Loan Documents, and each representation, warranty, covenant and condition hereunder and thereunder.

6.3.    **Successors and Assigns.**  This Security Instrument and all provisions hereof shall be binding upon and enforceable against the Trustor and its assigns and other successors.  This Security Instrument and all provisions hereof shall inure to the benefit of the Lender, its successors and assigns and any holder or holders, from time to time, of the Obligations, or any interest therein.

6.4.    **Amendments.**  This Security Instrument may be amended at any time and from time to time only by an amendment in writing executed by Lender and Trustor.

6.5.    **Rules of Construction.**  When the identity of the parties or other circumstances make appropriate, the neuter gender shall include the feminine and masculine, and the singular number shall include the plural.  Specific enumeration of rights, powers and remedies of Lender and of acts which they may do and of acts Trustor must do or not do shall not exclude or limit the general.  The headings of each Section are for information and convenience and do not limit or construe the contents of any provision hereof.  The provisions of this Security Instrument shall be construed as a whole according to their common meaning, not strictly for or against any party and consistent with the provisions herein contained, in order to achieve the objectives and

Exhibit B, Page 20

4818-6634-2472, v. 2

purposes of these grants.  The use in this Security Instrument (including any Exhibit hereto) of the words "including", "such as" or words of similar import when following any general term, statement or matter shall not be construed to limit such statement, term or matter to the specific items or matters, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such statement, term or matter; the use herein of the words "costs" or "expenses" shall include the cost of title evidence and reasonable out of pocket fees and costs of attorneys for Lender (outside counsel); and the use herein of the word "prompt", or "immediately" in any form, or words of similar import, when used with reference to any notice required to be given or act to be undertaken by Trustor shall mean notice given or act performed not later than ten (10) days after the occurrence of the specified event for which notice or action is required, unless another time period is made expressly applicable.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Security Instrument shall refer to this Security Instrument as a whole and not to any particular provision of this Security Instrument.  If Trustor is composed of more than one person or entity, then the obligations of Trustor under this Security Instrument and under the other Loan Documents are joint and several; and each covenant, warranty, representation and agreement of Trustor hereunder and thereunder shall be deemed made by each such person or entity comprising Trustor, both individually and collectively.

6.6.    **Severability**.  If any term of this Security Instrument, or the application thereof to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Security Instrument, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Security Instrument shall be valid and enforceable to the fullest extent permitted by law.

6.7.    **Substitute Trustee**.  Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Pledged Property is situated, shall be conclusive proof of proper substitution of the successor trustee.  The successor trustee shall, without conveyance of the Pledged Property, succeed to all the title, power and duties conferred upon the Trustee in this Security Instrument and by Idaho law.  The instrument of substitution shall contain the name of the original Lender, Trustee and Trustor under this Security Instrument, the book and page where this Security Instrument is recorded, and the name and address of the successor trustee.  If notice of default has been recorded, this power of substitution cannot be exercised until after the reasonable out of pocket costs, fees and expenses of the then acting Trustee have been paid to such Trustee, who shall endorse receipt of those costs, fees and expenses upon the instrument of substitution.  The procedure provided for substitution of trustee in this Security Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

6.8.    **Governing Law**.    THIS SECURITY INSTRUMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND

4818-6634-2472, v. 2

CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF IDAHO APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA). TO THE FULLEST EXTENT PERMITTED BY LAW, TRUSTOR AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT.

6.9.    **Venue.**  Any legal suit, action or proceeding against Trustor arising out of or relating to this Security Instrument may at Lender's option be instituted in any federal or state court in or having jurisdiction with respect to Ada County, Idaho, and Trustor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Trustor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Nothing herein shall affect the right of Lender to serve process in any manner permitted by law or limit the right of Lender to bring proceedings against Trustor in any other court or jurisdiction that Lender may elect in its sole and absolute discretion, and Trustor waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and Trustor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Each of the parties hereto waives personal service of process and irrevocably consents to service of process in the manner provided for notices in Section 6.1 hereof.  Nothing in this Security Instrument will affect the right of any party to this Security Instrument to serve process in any other manner permitted by law.

6.10.  **Commingling of Funds.**  No sums collected or retained by Lender shall be deemed to be held in trust; and Lender may commingle any and all such funds or proceeds with its general assets and shall not be liable for the payment of any interest or other return thereon, except to the minimum extent required by law.

6.11.  **Late Charges.**  Trustor recognizes and acknowledges that any default on any payment, or portion thereof, due hereunder or to be made under any of the other Loan Documents, will result in losses and additional expenses to Lender for the loss of use of funds not timely received.  If for any reason Trustor fails to pay any interest or principal or any other sum required to be paid under this Security Instrument within five (5) days following the date such sums are due, excluding any payment due at maturity or upon acceleration, or fails to pay any amounts due under any of the other Loan Documents within five (5) days following the date such sums are due, then (in lieu of damages for any detriment proximately caused thereby which would be extremely difficult and impracticable to ascertain or compute) Trustor shall pay to Lender, in addition to any such delinquent payment, an amount equal to five percent (5%) of such delinquent payment ("Past Due Charge").  In addition, upon the Maturity Date and upon the occurrence and during the existence of an Event of Default (or upon any acceleration), interest shall automatically accrue hereunder, without notice to Borrower, at the Default Rate.  The Default Rate shall be calculated and due from the date that the

Default occurred which led to the Event of Default without regard to any grace or cure period as may be applicable, and shall be payable upon demand.

6.12. **Waiver of Jury Trial**. TRUSTOR AND, BY ITS ACCEPTANCE OF THIS SECURITY INSTRUMENT, LENDER, EACH HEREBY (i) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THIS SECURITY INSTRUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (ii) AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS SECURITY INSTRUMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

6.13. **Reconveyance**. Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Pledged Property and shall surrender this Security Instrument and the Note to Trustee. Trustee and Lender shall execute such documents reasonably required to complete such conveyance; provided that Trustee shall reconvey the Pledged Property without warranty to the person or persons legally entitled to the Pledged Property. Such person or persons shall pay Trustee's reasonable out of pocket costs incurred in so reconveying the Pledged Property, which payment obligation is secured hereby.

6.14. **Counterparts**. This Security Instrument may be executed in any number of counterparts, all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Receipt of an executed signature page to this Security Instrument by facsimile or other electronic transmission shall constitute effective delivery thereof.

[Remainder of page intentionally left blank;
Signatures on following pages]

Exhibit B, Page 23

**IN WITNESS WHEREOF**, Trustor has executed this Security Instrument on the day and year set forth above.

**TRUSTOR:**

C.A.R.S. ENTERPRISES, INC.
an Idaho limited liability company

By: _____
    Ryan W. Hawkes, President

STATE OF Idaho )
             : ss.
COUNTY OF Ada )

On the 25 day of May, 2017, Ryan W. Hawkes, as President of C.A.R.S. Enterprises, Inc., the signer of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that he executed the same.

_____
NOTARY PUBLIC

Commission expires
February 1, 2018

Exhibit B, Page 24

4818-6634-2472, v. 2

**IN WITNESS WHEREOF,** Trustor has executed this Security Instrument on the day and year set forth above.

**TRUSTOR:**

_____
Ryan W. Hawkes

_____
Suzann Hawkes, consent to mortgage

STATE OF _Idaho_ )
: ss.
COUNTY OF _Ada_ )

On the _25_ day of May, 2017, Ryan W. Hawkes and Suzann Hawkes, the signers of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that they executed the same.

_____
NOTARY PUBLIC

Commission expires
February 1, 2018

CURTIS GRIEVE
NOTARY
PUBLIC
STATE OF IDAHO

Exhibit B, Page 25

**IN WITNESS WHEREOF,** Trustor has executed this Security Instrument on the day and year set forth above.

**TRUSTOR:**

_____
Curtis D. Grieve

_____
Andrea M. Grieve, consent to mortgage

STATE OF _Idaho_    )
                    : ss.
COUNTY OF _Ada_     )

On the _25_ day of May, 2017, Curtis D. Grieve and Andrea M. Grieve, the signers of the foregoing instrument, personally appeared before me, a notary public in and for said State, and acknowledged to me that they executed the same.

_____
NOTARY PUBLIC

Commission expires
february 1, 2018

RYAN W. HAWKES
NOTARY
PUBLIC
STATE OF IDAHO

Exhibit B, Page 26

Exhibit A
Pledged Property

Lot 1:

Real property located in Canyon County, Idaho, commonly known as 2615 Cleveland
Boulevard, Caldwell, Idaho 83605, and described more particularly as follows:

The following described real property situated in Canyon County, State of Idaho, to wit:

This parcel is situated in the SW 1/4 of Section 26, Township 4 North, Range
3 West of the Boise Meridian, and is more particularly described as follows:

Commencing at the SW corner of said Section 26;

Thence N 0° 26' 00" W, along the West boundary of said Section 26, a
distance of 1824.21 feet to a point of the Northeasterly boundary of the right-
of-way for E. Cleveland Boulevard;

Thence S 46° 49' 00" E, along the Northeasterly boundary of E. Cleveland
Boulevard, a distance of 986.75 feet to the TRUE POINT OF BEGINNING;

Thence N 43° 11' 00" E, parallel with the Southeasterly boundary of the right-
of-way for S. 26th Avenue, a distance of 264.00 feet to a point on the
Southwesterly boundary of the right-of-way for Blaine Street;

Thence S 46° 49' 00" E, along the Southwesterly boundary of the right-of-way
for said Blaine Street, a distance of 136.51 feet;

Thence S 43° 11' 00" W, parallel with the Southeasterly boundary of the right-
of-way for said S. 26th Avenue, a distance of 264.00 feet to a point on the
Northeasterly boundary of the right-of-way for said E. Cleveland Boulevard;

Thence N 46° 49' 00" W, along the Northeasterly boundary of the right-of-way
for said E. Cleveland Boulevard, a distance of 136.51 feet to the TRUE
POINT OF BEGINNNING.

Said real property is more commonly known as: 2615 Cleveland Boulevard, Caldwell,
Idaho, 83605.

Property Tax Parcel Number: R35345-000

Exhibit B, Page 27

Lot 2:

Real property located in Ada County, Idaho, commonly known as 1450 E Covey Run Ct., Eagle, Idaho 83616, and more particularly described as follows:

LOT 14, BLOCK 44 OF BROOKWOOD SUBDIVISION NO. 10, ACCORDING TO THE OFFICIAL PLAT THEREOF, FILED AS INSTRUMENT NO. 104066870 IN BOOK 89 OF PLATS AT PAGES 10,263 THROUGH 10,266, RECORDS OF ADA COUNTY, IDAHO. SUBJECT TO RESTRICTIVE COVENANTS AND CONDITIONS RECORDED OCTOBER 30, 2001, INSTRUMENT NO. 100013379, RECORDS OF ADA COUNTY, IDAHO.

Property Tax Parcel Number: R1097050120


Lot 3:

Real property located in Ada county, Idaho, commonly known as 623 N. Cove Colony Way, Eagle, Idaho 83616, and more particularly described as follows:

LOT 2 IN BLOCK 3 OF THE COLONY SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF, FILED IN BOOK 79 OF PLATS AT PAGE(S) 8524 THROUGH 8527, RECORDS OF ADA COUNTY, IDAHO.

Property Tax Parcel Number: R1523650110

4818-6634-2472. v. 2